OPINION
{¶ 1} Defendant-appellant Gail Ratliffe appeals the April 28, 2006 Judgment Entry of the Delaware Municipal Court overruling her motion for acquittal and finding her guilty of telecommunications harassment, pursuant to R.C. 2917.21(B). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Pursuant to a Shared Parenting Plan between appellant and Michael Ratliffe concerning the parties' minor child, Nick Ratliffe, appellant was to have reasonable contact with the child while in the physical custody of Michael Ratliffe.
 {¶ 3} On December 10th and 11th, 2005, appellant left numerous telephone messages on Michael Ratliffe's answering machine. On December 13, 2005, the State charged appellant with telecommunications harassment. Following a trial to the court, via Judgment Entry of April 28, 2006, the trial court found appellant guilty of the charge, and ordered she pay a monetary fine and court costs.
 {¶ 4} Appellant now appeals, assigning as error:
 {¶ 5} "I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN THE INSTANT CASE WHEN IT OVERRULED DEFENDANT/APPELLANT'S MOTION FOR ACQUITTAL AND PROCEEDED TO FIND DEFENDANT/APPELLANT GUILTY OF TELECOMMUNICATIONS HARASSMENT."
 {¶ 6} Appellant argues the evidence introduced at trial demonstrates her legitimate concerns for her son, and the complainant's purposely not answering the phone to allow her to communicate with her son in violation of the Shared Parenting Plan. She argues the evidence demonstrates her intent was to discuss on-going concerns with regard to the minor child; not to abuse, threaten or harass.
 {¶ 7} In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."Id. at paragraph two of the syllabus.
 {¶ 8} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172,175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 9} Appellant was charged with violating R.C. 2917.21(B), which provides:
 {¶ 10} "(B) No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse, threaten, or harass another person."
 {¶ 11} Appellant asserts there is no evidence she made the calls with the intent to abuse, threaten, annoy or harass. Rather, she maintains the evidence demonstrates the messages were made with regard to reminding the child of Christmas related activities, and the phone calls were not returned as requested.
 {¶ 12} Upon review of the record, appellant's ex-husband testified he returned home from bowling on the dates at issue and listened to the messages left by appellant on the answering machine:
 {¶ 13} "Q. Describe the messages.
 {¶ 14} "A. The messages were basically where are you at, why aren't you there, basically calling, again, calling my parents hillbillies, dumb asses, in that remark. You know, just, just anything that you could think of that she wanted to call them, she's called them, you know.
 {¶ 15} "Q. Okay. There is an answering machine located at what address?
 {¶ 16} "A. 27 Vine Street.
 {¶ 17} "Q. And what phone number was associated with that?
 {¶ 18} "A. 363-1479.
 {¶ 19} "Q. Okay. And about how many messages were on the answering machine?
 {¶ 20} "A. Anywhere from — on the answering machine there was probably about 10-15."
 {¶ 21} Tr. at p. 9.
 {¶ 22} Michael Ratliffe further testified appellant's voice sounded impaired from drinking alcohol.
 {¶ 23} Doshi Ratliffe, Michael Ratliffe's mother, testified:
 {¶ 24} "Q. Okay. I'd like to take your attention to that day, December 10 th, 2005, and ask if you were there that day in a position where you could receive telephone calls?
 {¶ 25} "A. Yes, I was.
 {¶ 26} "Q. And did you receive some telephone calls from a person that you knew as Gail Ratliff?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. What is Gail Ratliff s relationship to you or more specifically what was her relationship to you on December 10th, 2005?
 {¶ 29} "A. Ex-daughter-in-law.
 {¶ 30} "Q. And describe the nature of the telephone calls that you received that day, December 10th, 2005, at your house from Gail Ratliff?
 {¶ 31} "A. Well, first couple calls I did not answer the phone. In fact, there was two or three times that she had called and I didn't answer the phone because of an incident the day before and then I did answer the phone.
 {¶ 32} "Q. First of all let me just, when you say you didn't answer the phone, I take it you have caller ID?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. So you could look at the caller ID and see from whom the call was coming?
 {¶ 35} "A. Yes.
 {¶ 36} "* * *
 {¶ 37} "Q. Okay. Now after those first three calls or so where she left messages, describe what further happened then with regard to telephone calls coming from her?
 {¶ 38} "A. I answered the phone and I said, I told her that, I said, Gail, Mike and Nick are not here, and I said, so that you won't have to keep calling back, I will have them to call you as soon as they get home. And I didn't know that Michael was bowling that day, they were doing makeup games and he didn't get home until late and in the mean time she made a lot of calls, even after.
 {¶ 39} "Q. Approximately how many?
 {¶ 40} "A. I think there was around 52.
 {¶ 41} "Q. And did they all leave a message of some sort?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. And describe the messages. Well, not all 52 of them.
 {¶ 44} "The Court: Thank you.
 {¶ 45} "Q. Were these messages —
 {¶ 46} "A. During our conversation when I did call her, she wanted to discuss with me why my son was living with me and why I didn't make them get out and why that, that I and that I did not want them there and the things and she wanted me to admit that, she wanted me to tell her that I did not want them in my house and that I didn't want to take care of them or cook for them and I knew I did and why don't you have them get out, why don't you have him to get out.
 {¶ 47} "Q. Okay. Now —
 {¶ 48} "A. And then from there on it was what she left on the phone on the messages.
 {¶ 49} "Q. Well, let me go to that conversation though because you apparently were talking to her live during that conversation?
 {¶ 50} "A. Yes. That was whenever she talked to me or whenever she called back and things.
 {¶ 51} "Q. Well, when she called around 52 times, many of those were on the answering machine?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. But when you talked to her face or over the phone the first early in the day, did you tell her, I assume you gave her some sort of answer to those questions that she was asking you to admit, did you say anything back to her when she was saying that she wanted you to admit that you didn't want them there or something like that or what did you tell her?
 {¶ 54} "A. I told her that I did not have to answer her questions and then that's when she got, she called me a dumb hillbilly and things like that —
 {¶ 55} "Q. Okay.
 {¶ 56} "A. — And she made me mad and I hung up on her.
 {¶ 57} "Q. When you hung up, did you ever answer the phone again?
 {¶ 58} "A. I don't remember answering it more times.
 {¶ 59} "Q. Okay. When she left messages, were the messages abusive or describe what the messages sounded like.
 {¶ 60} * * *.
 {¶ 61} "A. Well, she just said at different times, it was, Michael, call me, and all this and then it would be, Nick, it's your mom, call me, and then she started with, . . . my son was, I mean grandson and she called them names.
 {¶ 62} "Q. Now when you say names, what did she say about them? What names did she call them?
 {¶ 63} "A. She called my grandson a rapist.
 {¶ 64} "Q. Okay. What else did she say?
 {¶ 65} "A. And she called, well, she called me dumb hillbilly and said all the Ratliffes was idiots and she, my son was abusive and the tried, I mean just things like that.
 {¶ 66} "Q. Okay. And those are the types of messages that she left throughout the day?
 {¶ 67} "A. Yes, just pretty much the same thing."
 {¶ 68} Tr. at 32-38.
 {¶ 69} In addition, David Sturman, a Police Officer with the City of Delaware, testified at trial relative to the tape recorded evidence obtained on December 12, 2005. The tape recording evidence demonstrates appellant called appellee's answering machine numerous times with only a few minutes between each phone call. Appellant left messages calling her ex-husband an abuser, threatening legal retaliation and berating appellee's family calling them "hillbillies." In one of the messages, appellant tells her son he is no longer invited to Christmas, his father beat her and until he accepts the fact, he is no longer her son. The tape recording demonstrates appellant made repeated, consecutive phone calls to appellee with the purpose to abuse, threaten and harass appellee and his family.
 {¶ 70} Based upon the above, we find the essential elements of the crime set forth in R.C. 2917.21(B) proven beyond a reasonable doubt, and the trial court did not err in overruling appellant's motion for acquittal and finding appellant guilty of telecommunications harassment.
By: Hoffman, P.J.
Edwards, J. and
Boggins, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Delaware Municipal Court is affirmed. Costs assessed to appellant.